**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Joshua Baker, et al.,

               Plaintiff,

v.

Unknown Snow, et al.,

               Defendants.

No. CV-19-02287-PHX-DWL

**ORDER**

In this civil rights action under 42 U.S.C. § 1983, Plaintiff Todd Brown ("Plaintiff") alleges that Phoenix Police Department ("PPD") Officers Snow and Mesquita (together, "Defendants") violated his Fourth Amendment rights during a traffic stop.  Now pending before the Court is Defendants' motion for summary judgment.  (Doc. 56.)  For the following reasons, the motion is granted.

## BACKGROUND

I.    <u>Underlying Facts</u>

The facts set forth below are derived from the parties' separate statements of facts (Docs. 57, 64)[1] and from the video of the events in question (Doc. 60).  Although the Court has generally construed the facts in the light most favorable to Plaintiff, as the non-movant,

---

[1]    In the Rule 16 scheduling order, the Court informed the parties that "Local Rule of Civil Procedure 56.1 is suspended, except for subsection (d). . . .  In other words, the parties may not file separate statements of facts or separate controverting statements of facts, and instead must include all facts in the motion, response, or reply itself."  (Doc. 17 at 5-6.)  Unfortunately, the parties ignored this instruction and filed separate statements of facts in support of their respective summary judgment submissions.  Because both parties followed this approach, the Court will rely on their separate statements.

and resolved factual disputes in his favor, "we do not accept a non-movant's version of events when it is 'clearly contradict[ed]' by a video in the record." *Hernandez v. City of Gilbert*, 989 F.3d 739, 743 (9th Cir. 2021) (quoting *Scott v. Harris*, 550 U.S. 372, 378-80 (2007)).

On February 15, 2018, Plaintiff, Joshua Baker ("Baker"), and a third person were riding in a car driven by Baker. (Doc. 64 ¶ 1.) Plaintiff was the front seat passenger. (*Id.* ¶ 2.) As the car pulled up to a stoplight at the intersection of 16th Street and Southern, Defendants—who are members of the PPD gang unit—pulled up behind them in an unmarked unit. (Doc. 57 ¶¶ 2-7; Doc. 64 ¶¶ 16-20.) The stop occurred in an area that Defendants "considered to be a high gang activity area." (Doc. 64 ¶ 23.) After Officer Mesquita noticed dark window tinting on Baker's car, Officer Snow ran the license plate and discovered it was suspended. (Doc. 57 ¶¶ 8-10; Doc. 64 ¶¶ 21-24.)

When the light changed, Defendants began tailing Baker's car. (Doc. 57 ¶¶ 11-16; Doc. 64 ¶¶ 26-33.) At some point, Officer Mesquita turned on the unit's flashing lights and sirens to initiate a traffic stop, although the lights and sirens did not remain activated the entire time. (Doc. 57 ¶11; Doc. 64 ¶¶ 29-31, 35, 37.) The officers followed Baker's car for 3-5 minutes before he turned into a parking lot in front of a recreation center where Plaintiff worked. (Doc. 57 ¶¶ 12-14; Doc. 64 ¶ 32-33.) As Defendants were following Baker's car, it "obeyed all traffic signals, made no unsafe lane changes, caused no other vehicles to have to brake or swerve, did not make any obvious evasive maneuvers, and entered the parking lot at . . . in a safe a proper manner." (Doc. 64 ¶ 34.) Nevertheless, according to the officers, "[t]he prolonged time and distance that Baker's vehicle continued traveling without stopping for [their] vehicle caused them to be concerned about the intentions of the occupants of Baker's vehicle; Snow believed the failure to stop for their police vehicle could be indicative of future behavior." (Doc. 57 ¶ 13.)[2]

As Baker slowed to a stop in front of the building where Plaintiff worked, the

---

[2]    While following Baker's car, the officers called for backup and requested support from an air unit. (Doc. 57 ¶ 16; Doc. 64 ¶ 39.) This request was inconsistent with the relevant PPD operations order, which limited the use of air units to situations involving high-speed driving and other evasive actions. (Doc. 64 ¶¶ 40-41.)

officers got out of their unit and approached Baker's car.  (Doc. 57 ¶ 19; Doc. 64 ¶¶ 42, 46.)  The parties dispute the precise sequence of the events that followed.  According to Defendants, Officer Snow was questioning Plaintiff, who was seated in the passenger seat, when "Baker's vehicle moved forward, which caused Snow to be further concerned about his safety and about the occupants' intentions towards his attempt to make contact with them." (Doc. 57 ¶ 21.) Defendants further contend that, "[w]hile Snow was at Plaintiff's side with the vehicle passenger door open, Snow requested Plaintiff to keep his hands visible and to stop moving, but Plaintiff reached his hand onto the dash and across the vehicle multiple times." (*Id.* ¶ 22.) According to Defendants, it was only after these developments occurred that "Snow had Plaintiff exit the vehicle" and then handcuffed Plaintiff and had Plaintiff sit on the curb "for officer safety reasons." (*Id.* ¶¶ 23-24.)

Meanwhile, Plaintiff contends that as he was opening the passenger door, he encountered Officer Snow "with his gun drawn, [who] told him to put his hands on the dash." (Doc. 67 ¶¶ 6, 9.)[3] Plaintiff further contends that, "[a]t the same time" he was interacting with Officer Snow outside the passenger door, Baker "was being pulled from the vehicle and slammed against the car by another officer, all before he could even put the vehicle in park." (*Id.* ¶ 7.) According to Plaintiff, "[t]his caused the vehicle to roll forward forcing [Plaintiff] to have to reach over and put the car in park." (*Id.* ¶ 8.) Plaintiff further contends that, after he was told to exit the vehicle and handcuffed, he "immediately began to inquire as to why he was being arrested only to be repeatedly told he was trying to run" and that Officer Snow also attempted to ask him about gang affiliations. (*Id.* ¶¶ 12-13.)

The Court has reviewed the videotape of the incident.  (Doc. 60.)  Although it doesn't reveal exactly what was going on inside Baker's car during the encounter, it does reveal that Baker's car came to a stop at the 1:03 mark of the video; that Plaintiff began opening the passenger door at the 1:05 mark, just as Officers Mesquita and Snow were exiting their police unit and beginning to walk toward Baker's car; that after the officers

---

[3]    Defendants don't dispute that Officer Snow initially pointed his service weapon at Plaintiff during the encounter—they merely note that, "[b]y the time Plaintiff exited Baker's vehicle, Snow no longer had his service gun pointing at him." (Doc. 57 ¶¶ 34-35.)

reached Baker's car, they initially allowed Baker and Plaintiff to remain inside, speaking with each of them through open doors while the car remained stationary; that such discussions continued until the 1:32 mark of the video, when Baker's car lurched forward; that after Baker's car stopped following the forward lurch, Officer Mesquita removed Baker from the car and handcuffed him across the trunk and back windshield; and that Plaintiff then exited Baker's car at the 1:58 mark, after which he was handcuffed and made to sit on a nearby curb.   In the Court's view, this video evidence clearly contradicts Plaintiff's assertion that the officers pulled Baker from the car "before he could even put the vehicle in park," thereby causing the car to lurch forward.  The video reveals that Baker had ample opportunity to place the car in park—indeed, it was stationary for nearly 30 seconds (1:03 to 1:32) before it lurched forward—and that Officer Mesquita did not remove Baker from the car until after it had stopped for a second time.  Accordingly, the Court does not credit Plaintiff's evidence on these specific points.  *Hernandez*, 989 F.3d at 743.

When Officers Snow and Mesquita made their initial contact with the occupants of Baker's car, they smelled marijuana.  (Doc. 57 ¶ 28; Doc. 64 ¶ 47.)[4]  As a result, they decided to search the car, the trunk, and the backpacks inside the car.  (Doc. 57 ¶ 28; Doc. 64 ¶ 48.)  Plaintiff "was also personally searched, including having the waistband of his gym shorts pulled forward to view his genital area."  (Doc. 64 ¶ 50.)  Additionally, the car's window tint was tested, and the officers further investigated the status of the car's registration, as well as Baker's learner's permit.  (Doc. 57 ¶¶ 26-27.)  After the officers failed to find any drugs, they cited Baker for the improper window tint and the suspended registration.  (Doc. 57 ¶ 29; Doc. 64 ¶ 51.)  Plaintiff was not charged or cited.  (Doc. 64 ¶ 54.)

---

[4]    Although Plaintiff presents a variety of marijuana-related evidence in his separate statement—including that no marijuana was ultimately found in Baker's car, that neither he nor the other two occupants had smoked marijuana in the car or before getting into the car, and that Defendants didn't ask any marijuana-related questions during the encounter (Doc. 64 ¶¶ 51-53)—Plaintiff doesn't dispute Defendants' contention that they detected the odor of marijuana during the encounter.  Nor does Plaintiff dispute that the odor of marijuana was, in fact, emanating from Baker's car.  Thus, for summary judgment purposes, the Courts accepts as undisputed Defendants' contention that they detected the odor of marijuana.

1    As noted, the encounter took place outside Plaintiff's place of employment.  (Doc.

2    64 ¶ 55-56.)  Plaintiff was "kept handcuffed in front of his job, near the main entrance for

3    over thirty minutes," during which time "people were coming and going and [Plaintiff] was

4    being viewed by all the individuals that entered and exited through the doors, his

5    coworkers, and the children he was assigned to work with there at the rec center."  (*Id.*)

6    Plaintiff contends that, because of this encounter, he "was embarrassed and humiliated,

7    feared for his job, [was] concerned that his reputation with his fellow workers and the kids

8    at the center had been damaged" and his "sense of security and freedom" were negatively

9    affected.  (*Id.* ¶¶ 58-61.)

10    In April 2018, Baker was found responsible for the tinting and registration offenses

11    in Phoenix municipal court.  (Doc. 57 ¶ 31.)

12    II.    Procedural History

13    On January 15, 2019, Plaintiff and Baker initiated this action by filing the complaint

14    in state court.  (Doc. 1 at 5.)

15    On April 9, 2019, Defendants, along with then-defendant PPD, removed the action

16    to federal court.  (Doc. 1.)

17    On June 6, 2019, PPD was dismissed with prejudice pursuant to the parties'

18    stipulation.  (Doc. 7.)

19    During the discovery process, Defendants repeatedly attempted to depose Baker

20    without success.  Accordingly, on April 16, 2021, Baker's claims were dismissed with

21    prejudice.  (Doc. 55.)

22    On May 14, 2021, Defendants filed the pending summary judgment motion.  (Doc.

23    56.)

24    On June 29, 2021, Plaintiff filed a response.  (Doc. 63.)[5]

25    On July 21, 2021, Defendants filed a reply.  (Doc. 67.)

26    …

27    …

28

---

[5]    Plaintiff requested oral argument, but this request is denied because the issues are fully briefed and argument would not aid the decisional process.  *See* LRCiv 7.2(f).

- 5 -

**DISCUSSION**

I.    Summary Judgment Standard

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).  The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).  "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[T]o carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103.  Summary judgment is appropriate against a party that "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

…

…

## II.    The Parties' Arguments

In the complaint, Plaintiff alleges that Defendants "violated 42 U.S.C. § 1983 by depriving [him] of [his] right to be free from unlawful search and seizure as secured by the constitution." (Doc. 1 at 7.)  However, in their summary judgment papers, the parties only address, in any meaningful fashion, whether Defendants' *seizure* of Plaintiff was lawful. Plaintiff does not, in contrast, develop any argument that the *searches* conducted during the course of the seizure may provide an independent pathway to liability.

As for the seizures, Defendants contend they were justified in conducting the initial investigatory stop of Baker's car based on the window-tinting violation and their knowledge that the registration was suspended; that they developed officer-safety concerns based on Baker's failure to pull over for 3-5 minutes despite their use of spotlights and emergency flashing lights; that their safety concerns were further exacerbated when Baker's car lurched forward in the parking lot after initially stopping; that although their initial suspicions were only directed toward Baker, they developed independent suspicion as to Plaintiff based on the smell of marijuana emanating from the car; and that the resulting investigative detention of Plaintiff was reasonable.  (Doc. 56 at 1-2, 4-7.)  According to Defendants, these factors demonstrate that their seizure of Plaintiff was lawful, but at a minimum they are entitled to qualified immunity because "Plaintiff cannot point to binding precedent that clearly establishes the right at issue on the date in question under similar circumstances."  (*Id.* at 7.)  Finally, Defendants also seek summary judgment on the alternative ground that Plaintiff cannot provide evidence of his alleged emotional distress damages.  (*Id.*)

Plaintiff opposes Defendants' motion.  (Doc. 63.)  Unfortunately, most of Plaintiff's response consists of reciting the facts (*id.* at 1-5), identifying general legal principles related to the Fourth Amendment and qualified immunity (*id.* at 5-8), and identifying general legal principles related to the summary judgment standard (*id.* at 10).  In contrast, Plaintiff offers very little discussion of how the law applies to the facts of this case.  On that issue, Plaintiff merely contends that the seizure was unconstitutional because the

"governmental interest in apprehending him for the alleged misdemeanor of the person driving the vehicle" was slim, the officers acted excessively during the encounter by taking him "from the car at gun point and [holding him] against his will in handcuffs for more than thirty minutes," and he "was never investigated for suspected criminal act." (*Id.* at 8-9.) Plaintiff argues that summary judgment is not appropriate under these circumstances because "[c]learly in a case in which the Plaintiff is alleging that his 4th Amendment rights were violated as a result of an unlawful stop, illegal seizure, and illegal search, this is an instance in which the facts must be sorted through and examined to determine if any justification existed and if the intrusion outweighed the alleged justification" and "[t]he caselaw is clear that this is a duty of the Jury and not the Court." (*Id.* at 11.) Notably, in the section of his response entitled "Qualified Immunity," Plaintiff makes no effort to identify a previous case involving similar facts in which a Fourth Amendment violation was found. (*Id.* at 5-8.) Finally, in response to Defendants' arguments concerning damages, Plaintiff contends that his deposition testimony is sufficient to create a triable issue of fact. (*Id.* at 9-10.)

In reply, Defendants reiterate their position that the initial vehicle stop was lawful because they had probable cause that Baker had committed multiple violations of the traffic code (tinting and registration) and that Plaintiff's subsequent "investigatory detention was reasonable" because it "was related to the suspicion Plaintiff was engaged in criminal behavior related to the odor of marijuana, and not merely to the violations suspected of by the vehicle's owner and/or driver." (Doc. 67 at 2-3.)

III.   <u>Analysis</u>

The Court will begin with Defendants' invocation of the qualified immunity doctrine. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Thus, "[w]hen an officer asserts qualified immunity as a defense, . . . [courts] first ask whether the facts taken

in the light most favorable to the plaintiff show that the officer's conduct violated a constitutional right. If so, [courts] then ask whether the right in question was clearly established at the time of the officer's actions, such that any reasonably well-trained officer would have known that his conduct was unlawful." *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020) (citation omitted).

As for the second prong, a government official's conduct violates "clearly established" law when "the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft*, 563 U.S. at 741 (cleaned up). Although there need not be a "case directly on point," "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* In other words, the case law must "have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. City of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017). *See also Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) ("This Court has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.") (internal quotation marks omitted); *Sharp v. Cnty. of Orange*, 871 F.3d 901, 910-11 (9th Cir. 2017) ("The Supreme Court has repeatedly instructed that we examine whether the violative nature of particular conduct is clearly established by controlling precedent, not whether the conduct violates a general principle of law. . . . Except in the rare case of an 'obvious' instance of constitutional misconduct . . . , Plaintiffs must *identify* a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment. In other words, Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert *these* [defendants] *in this case* that *their particular conduct* was unlawful.") (cleaned up). Additionally, "the prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Sharp*, 871 F.3d at 911. *See also Tuuamalemalo v. Greene*, 946 F.3d 471, 477 (9th Cir. 2019) ("The right must be settled law, meaning that it must be

clearly established by controlling authority or a robust consensus of cases of persuasive authority.").

"Once the defense of qualified immunity is raised by the defendant, the plaintiff bears the burden of showing that the rights allegedly violated were 'clearly established.'" *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000). *See also Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991) ("The plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct.").[6]

Here, there is a strong argument that Defendants are entitled to summary judgment under the first prong of the qualified immunity test, on the ground that their challenged conduct was lawful.  Regarding the stop of Baker's car, the Fourth Amendment protects against "unreasonable searches and seizures" by the government, and "'its protections extend to brief investigatory stops of persons . . . that fall short of traditional arrest.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)).  "Because the balance between the public interest and the individual's right to personal security tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot." *Id.* (citations and internal quotation marks omitted).  "The quantum of proof needed for reasonable suspicion is less than a preponderance of evidence, and less than probable cause." *United States v. Tiong*, 224 F.3d 1136, 1140 (9th Cir. 2000).  "In evaluating the validity of a [*Terry*] stop . . . , [courts] must consider the totality of the circumstances—the whole picture." *United States v. Sokolow*, 490 U.S. 1, 8 (1989) (internal quotation marks omitted).  Significantly,

---

[6]      Although *LSO* and *Romero* place the burden on the plaintiff, other Ninth Circuit opinions hold that "[q]ualified immunity is an affirmative defense that the government has the burden of pleading and proving." *Frudden v. Pilling*, 877 F.3d 821, 831 (9th Cir. 2017). These opinions are difficult to reconcile. *See generally Slater v. Deasey*, 943 F.3d 898, 909 (9th Cir. 2019) (Collins, J., dissenting from denial of rehearing en banc) ("The panel committed . . . error in suggesting that Defendants bear the burden of proof on the disputed qualified-immunity issues presented in this appeal. . . .  [T]he applicable—and well-settled—rule [in the Ninth Circuit] is that the plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct.") (cleaned up).

reasonable suspicion of a violation of the traffic code may justify an investigatory stop of a car. *See, e.g.*, *Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020) (officer's knowledge that the registered owner of the truck had a revoked license "provided more than reasonable suspicion to initiate the stop"); *Whren v. United States*, 517 U.S. 806, 819 (1996) ("[T]he officers had probable cause to believe that petitioners had violated the traffic code.  That rendered the stop reasonable under the Fourth Amendment . . . ."); *United States v. Diskin*, 845 F. App'x 598, 599 (9th Cir. 2021) ("[T]he stop was lawful because the car was circulating with an expired license plate.").  The undisputed evidence establishes that Defendants possessed such reasonable suspicion here, by virtue of Baker's window-tinting and registration violations.  Thus, the initial stop of the car was lawful.

The somewhat closer question concerns the legality of the detention of Plaintiff after the initial stop of Baker's car.  As noted, Plaintiff was confronted by an armed officer and ultimately forced to sit, handcuffed, on a curb located just outside his workplace (and in view of his co-workers) for more than 30 minutes before being released.  In Plaintiff's view, this humiliating treatment was excessive and unconstitutional because he wasn't even suspected of committing the tinting and registration offenses that precipitated the encounter.

Although the Court is sympathetic to Plaintiff's position, he ignores Defendants' undisputed evidence that they detected the smell of marijuana after opening the door to Baker's car, which in turn caused them to develop reasonable suspicion that Plaintiff (and not just Baker) had committed a drug-related offense.  There is a strong argument that the presence of this reasonable suspicion justified the ensuing investigative detention of Plaintiff.  *See, e.g.*, *United States v. Johnson*, 2007 WL 186655, *8 (D. Nev. 2007) ("Officer Hank had reasonable suspicion to make a *Terry* stop to investigate the strong odor of marijuana and smoke he observed emanating from the group of four people with whom Johnson was standing.  Although defense counsel emphasized in cross examination that no one was cited or arrested for possession of marijuana that evening, and no marijuana was seized, . . . Officer Hank [still] had reasonable suspicion that criminal activity was

afoot at the time he seized Johnson in the parking lot and initiated an investigatory detention.").[7]  Although Plaintiff was handcuffed during much of the sequence, Plaintiff does not argue that this transformed the investigative detention into an arrest and handcuffing does not, in any event, automatically result in such a transformation. *Washington v. Lambert*, 98 F.3d 1181, 1186 (9th Cir. 1996) ("[P]ointing a weapon at a suspect and handcuffing him . . . will not *automatically* convert an investigatory stop into an arrest that requires probable cause."); *Porter v. Vignau*, 756 F. App'x 729, 730-31 (9th Cir. 2019) (holding that plaintiff waived any false-arrest claim by failing to raise it at summary judgment and emphasizing that the use of handcuffs is "only relevant to a determination of whether or not the act of handcuffing transformed a *Terry* stop into an arrest without probable cause, not whether the *Terry* stop itself was unreasonable"). Additionally, Defendants have proffered undisputed evidence that they developed officer-safety concerns based on Baker's failure to immediately pull over and on the lurching movement of Baker's car after it initially stopped.

Although the parties' summary judgment briefing suggests that Plaintiff's § 1983 claim rises and falls with the legality of Defendants' seizure of Plaintiff—Plaintiff does not develop any independent challenge to the searches that occurred during the course of the seizure—the analysis set forth above suggests that any search-related claim would fail even if it weren't forfeited.  Defendants correctly contend (Doc. 56 at 5), and Plaintiff does not dispute, that Plaintiff lacks standing to challenge the search of Baker's car.  *See, e.g.*, *United States v. Pulliam*, 405 F.3d 782, 786 (9th Cir. 2005) ("As a passenger with no possessory interest in the car Richards was driving, Pulliam has no reasonable expectation of privacy in a car that would permit [his] Fourth Amendment challenge to a search of the

---

[7]     *Cf. United States v. Laird*, 511 F.2d 1039, 1040 (9th Cir. 1975) ("[T]he odor of marijuana emanating from the trunk of Laird's vehicle provided the requisite probable cause for a search."); *United States v. Beard*, 708 F.3d 1062, 1066 (8th Cir. 2013) ("Goodman's search of the vehicle and seizure of the marijuana were lawful under the automobile exception because he smelled raw marijuana immediately after Beard rolled down his car window."); *United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991) (en banc) ("There is no doubt that the agent's suspicions rose to the level of probable cause when, as the door stood open, he detected what he knew from his law enforcement experience to be the odor of marijuana.").

car.") (citation and internal quotation marks omitted).  In a related vein, although Plaintiff's separate statement alludes to a search of backpacks that were present in Baker's car (Doc. 64 ¶ 48), the separate statement does not state that *Plaintiff's* backpack was searched as part of this process.  Plaintiff would not have standing to challenge a search of others' backpacks.[8]  Finally, as for the search of Plaintiff's person, it occurred after Defendants had developed reasonable suspicion (based on the marijuana odor) to conduct an investigative detention of Plaintiff.  And "[i]n connection with an otherwise lawful investigative detention under *Terry*, an officer may conduct a brief pat-down (or frisk) of an individual when the officer reasonably believes that the persons with whom he [or she] is dealing may be armed and presently dangerous." *United States v. Brown*, 996 F.3d 998, 1007 (9th Cir. 2021) (citations and internal quotation marks omitted).  Here, Defendants developed officer-safety concerns based on the length of the pursuit and the lurching-forward of Baker's vehicle midway through the stop and Plaintiff does not argue, in his summary judgment response, that the search of his person exceeded the permissible bounds of a search incident to a *Terry* stop.

For all of these reasons, Defendants are likely entitled to summary judgment under the first prong of the qualified immunity test.  Nevertheless, it is unnecessary to form any conclusive judgments about the constitutionality of their conduct.  *See, e.g.*, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (noting that district courts are vested with discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand"); *Camreta v.*

---

[8]    Alternatively, even if Plaintiff's backpack had been searched, it may have been permissible for Defendants to conduct a warrantless search of the backpack under the circumstances.  *See, e.g.*, *United States v. Roubideaux*, 357 F. App'x 801, 802 (9th Cir. 2009) (concluding that officers were "justified" in conducting a "warrantless search of Roubideaux's car and backpack" where the officers developed probable cause that such a search would reveal "the presence of drugs"); *United States v. Reeves*, 604 F. App'x 823, 827 (11th Cir. 2015) ("Because Scott had probable cause to search the car for narcotics . . . Scott lawfully accessed the trunk and the backpack . . . [and] was permitted to search any part of the backpack in which drugs may be found . . . ."); *United States v. Green*, 2020 WL 3057136, *1 (C.D. Ill. 2020) ("[T]he Trooper made a valid traffic stop for improper lane usage and failure to signal.  The Trooper making the stop had the drug sniffing dog with him and immediately conducted the open air sniff . . . [which] provided a probable cause to search for contraband in the trunk without a warrant.  The scope of the permissible search included containers in the trunk such as the backpack.") (citations omitted).

1    *Greene*, 563 U.S. 692, 705 (2011) ("[A] longstanding principle of judicial restraint requires

2    that courts avoid reaching constitutional questions in advance of the necessity of deciding

3    them.") (citations omitted).  This is because Defendants are entitled to summary judgment

4    under the second prong of the qualified immunity test, which addresses whether there was

5    "prior case law that articulates a constitutional rule specific enough to alert *these*

6    [defendants] *in this case* that *their particular conduct* was unlawful."  *Sharp*, 871 F.3d at

7    911.  Here, Plaintiff has made no effort whatsoever to identify such a case.  Instead, his

8    response brief is filled with citations to factually inapposite cases intended to establish

9    generic and uncontroversial Fourth Amendment principles.  For example, Plaintiff cites

10   *Hesterberg v. United States*, 71 F. Supp. 3d 1018 (N.D. Cal. 2014), in the portion of his

11   brief addressing whether there was a "Fourth Amendment Violation" (Doc. 63 at 8-9), but

12   that case addressed "whether it was objectively reasonable," for purposes of state-law

13   claims for battery and negligence, for "National Park Service Ranger Sarah Cavallaro to

14   tase Plaintiff . . . , who indisputably posed no danger to Ranger Cavallaro, the public, or

15   himself, but had refused Cavallaro's command not to leave the scene after she had already

16   warned him about walking his dog off leash and he had complied."  *Hesterberg*, 71 F.

17   Supp. 3d at 1020.  Those facts are not remotely similar to the facts of this case.  Given this

18   backdrop, and because the Court has been unable through its own research to identify a

19   prior case that "developed in such a concrete and factually defined context to make it

20   obvious to all reasonable government actors, in [Defendants'] place, that what [they are]

21   doing violates federal law," *Shafer*, 868 F.3d at 1117, Defendants are entitled to qualified

22   immunity.[9]

23            …

24            …

25            …

26            …

27

28   _____

     [9]      Given this conclusion, it is unnecessary to address Defendants' challenge to the
     sufficiency of Plaintiff's damages evidence.

Accordingly,

**IT IS ORDERED** that:

(1)     Defendants' motion for summary judgment (Doc. 56) is **granted**.

(2)     The Clerk shall enter judgment accordingly and terminate this action.

Dated this 29th day of October, 2021.

_____
Dominic W. Lanza
United States District Judge